FILED'09 MAR 18 09:16 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHURCH OF THE HOLY LIGHT OF
THE QUEEN, et al.,

           CV 08-3095-PA

     Plaintiffs,

  v.          **FINDINGS OF FACT AND**
            **CONCLUSIONS OF LAW**

MICHAEL B. MUKASEY, et al.,

     Defendants.

**PANNER, J.**

  The issue is whether plaintiffs, who are followers of the
Brazilian Santo Daime religion, are entitled to an exemption
from the Controlled Substances Act to import and drink their
sacrament, Daime tea.  Because Daime tea contains the
hallucinogen DMT, which is a Schedule I controlled substance,
the federal government contends that it may prohibit
plaintiffs' possession and use of Daime tea regardless of its
use as a sacrament in plaintiffs' religion.

  Guided by the unanimous decision of the United States
Supreme Court in a very similar case, <u>Gonzales v. O Centro
Espírita Beneficente União do Vegetal</u>, 546 U.S. 418 (2006) (<u>UDV
III</u>), I conclude that the Religious Freedom Restoration Act, 42
U.S.C. §§ 2000bb to 2000bb-4, requires that plaintiffs be

1  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

allowed to import and drink Daime tea for their religious
ceremonies, subject to reasonable restrictions.  I will enter
a judgment and permanent injunction.

These are my findings of fact and conclusions of law after
the court trial.  Fed. R. Civ. P. 52(a).

**FINDINGS OF FACT**

## I.  The Plaintiffs

There are about 80 active members of the Santo Daime
church living in Oregon.  The plaintiff Church of the Holy
Light of the Queen (CHLQ) in Ashland has about 40 active
members.  CHLQ oversees a small satellite church in Bend with a
few members.

Plaintiff Jonathan Goldman is CHLQ's spiritual leader or
"padrinho."  Goldman has been studying the Santo Daime religion
for 21 years, traveling frequently to Brazil to receive
instruction from church leaders.  He has learned Portuguese to
understand the Santo Daime hymns that constitute church
doctrine.  Goldman has been an initiate of the Santo Daime
church for almost 19 years.  He founded CHLQ in 1993 with
authorization from the Santo Daime mother church in Brazil.

I find that Goldman's testimony is credible.  His conduct
over the years shows his sincerity and dedication to CHLQ and
its members.

There is a separate Santo Daime church in Portland, called
Céu da Divina Rosa (Church of the Divine Rose), with about 25
active members.  The Portland church is led by plaintiff
Alexandra Bliss Yeager.  I find Bliss-Yeager's testimony to be

forthright and honest.

The four remaining plaintiffs, Jacquelyn Prestidge, Gathel Scott Ferguson, Miriam Ramsey, and Mary Row, M.D., are active members of CHLQ.  I credit the testimony of these plaintiffs and the other church members who testified.  These witnesses appear to represent a reasonable cross-section of church members.  Many CHLQ members did not want to testify because they feared repercussions if their membership in a controversial church became public.

## II.  The Santo Daime Religion

The Santo Daime religion has its origins in the jungles and rainforests of South America.  For many centuries indigenous tribes of the Amazon and Orinoco river basins have brewed a psychoactive drink from a vine, *Banisteriopsis caapi*, which they use as a medicine and in religious rituals.  Both the vine and beverages brewed from the vine are called "ayahuasca," which means "vine of souls" or "vine of the dead." As the name implies, ayahuasca is believed to allow communication with the spirit world.

According to Santo Daime lore, the religion's founder, an Afro-Brazilian man named Raimundo Irineu Serra, worked as an itinerant rubber tapper and guard in the remote Amazon region of northern Brazil when he met a shaman who taught him about ayahuasca.  Irineu, now known as Master Irineu, had visions of a woman who called herself the Queen of the Forest, whom he later identified as the Virgin Mary.  The woman instructed him to start a new religion using ayahuasca as its sacrament, telling him that ayahuasca should be called "Daime," a

Portuguese word meaning "give me," as in the prayer, "give me light," "give me strength," "give me wisdom."

Santo Daime is a syncretic religion, blending elements of Catholicism with indigenous Amazonian and African beliefs. Followers of the Santo Daime religion believe that Daime tea is the blood of Christ, analogous to wine in the Catholic Communion.  They also believe that Daime tea itself is a holy being of great power.  Daime tea is consumed during all Santo Daime services.  CHLQ cannot survive as a viable church without the Daime tea.

Although ayahuasca generally may be brewed with a variety of different plants, the Santo Daime religion requires that Daime tea be brewed from only the *B. caapi* vine (which plaintiffs call Jagube), and leaves of the shrub *Psychotria viridis* (which plaintiffs call Rainha).  If consumed orally, digestive enzymes destroy the DMT in *P. viridis* leaves before the DMT can take effect.  In Daime tea, however, the harmala alkaloids in the *B. caapi* vine temporarily inhibit digestive enzymes, allowing DMT in the *P. viridis* leaves to reach the bloodstream and become psychoactive.  Daime tea's synergistic action is complex and not yet fully understood.

Following Master Irineu's death in 1971, Santo Daime split into different groups.  CHLQ is affiliated with the Santo Daime church started in 1974 by Sebastião Mota de Melo (known as Padrinho Sebastião).  When Padrinho Sebastião died in 1990, he was succeeded by his son, Alfredo Gregorio de Melo.  De Melo has overseen the growth of the Santo Daime church in Brazil, and the opening of branch churches in the United States, Japan,

and Europe.

The head office of the Santo Daime church, which is called Centro Eclectico da Fluente Luz Universal Raimundo Irineu Serra (CEFLURIS), authorizes and supervises the churches in Ashland and Portland.  CEFLURIS is responsible for brewing the Daime tea and shipping it to CHLQ in Ashland and to the Portland church.  CHLQ is responsible for distributing Daime tea to the satellite group in Bend.

The Brazilian government, after studying the Santo Daime religion and the effects of Daime tea on church members, has recognized the Santo Daime church as a legitimate religion and permits sacramental use of Daime tea.  The Catholic Church in Brazil considers Santo Daime to be a valid religion and treats the Santo Daime church as a full partner on humanitarian and environmental issues.  Santo Daime is also recognized as a legitimate religion in Spain and the Netherlands.

The Brazilian government has recognized another syncretic ayahuasca-based religion, the União do Vegetal (UDV) church. The UDV church, which was founded in 1961, differs somewhat from Santo Daime in doctrines and practices, but the UDV's sacrament, called "hoasca" (the Portuguese transliteration of ayahuasca), is identical to Daime tea, and hoasca is consumed only during church ceremonies.

Defendants emphasize that during the late 1970s, Padrinho Sebastião briefly condoned the ritual use of marijuana, which he called Santa Maria (Holy Mary).  Brazilian authorities did not approve the new sacrament, and the Santo Daime church has affirmed that the Daime tea is the church's only sacrament and

that the church does not permit ritual use of marijuana.

Goldman testified that Padrinho Sebastião, a simple, illiterate man who venerated all plants, was persuaded to condone the use of marijuana while he was living in a tiny isolated community in the jungle. Goldman testified that CHLQ has never permitted marijuana use because Daime tea is CHLQ's only sacrament. CHLQ discourages the use of drugs, including alcohol and marijuana, especially during the days before a CHLQ "work" when Daime tea will be consumed. There is no evidence that marijuana has been a part of CHLQ practice.

Defendants point out that when federal agents raided Goldman's house in 1999 to confiscate a shipment of Daime tea, they also seized an unspecified amount of marijuana from Goldman's bedroom. Plaintiffs state in a brief that the marijuana belonged to Goldman's wife, who was using it for medical purposes. Reply Br. 10 n.9. At trial, Goldman testified that he was aware of the marijuana, but he did not give any explanation for its presence. Regardless of why marijuana was in Goldman's bedroom nearly ten years ago, a spiritual leader's possible personal failings should not discredit the entire church.[1]

Defendants also note that a very small minority of CHLQ members stated on intake questionnaires that they occasionally smoked marijuana, although they were trying to quit. This does

---

1.  Federal agents also claimed to have seized a small amount of bufotenine, a hallucinogenic drug derived from animal secretions. Goldman testified that he had no knowledge of bufotenine or its presence in his house, and that he had never heard of bufotenine until learning about it through the discovery process a few months ago.

not reflect on CHLQ itself or on the majority of church members.

### III.  Events Leading to this Litigation

After Goldman's arrest and the seizure of Daime tea in 1999, plaintiffs attempted through counsel to negotiate an agreement with the U.S. Department of Justice.  The Department refused to consider a religious exemption for plaintiffs.  <u>See</u> Pls.' Ex. 44.

Plaintiffs were more successful with the State of Oregon. In 2000, the Oregon Board of Pharmacy determined that CHLQ's religious use of Daime tea was a "non-drug" use and therefore not subject to state drug laws and regulations.  Since then, Daime tea has enjoyed a status under Oregon law similar to the status of peyote when used as a sacrament by the Native American Church.

At about the same time as the raid on Goldman's house, federal agents seized hoasca from a UDV branch church in Santa Fe, New Mexico.  Later that year, the New Mexico UDV church brought an action in U.S. District Court, seeking injunctive relief.  In 2002, U.S. District Court issued a preliminary injunction, allowing the UDV church to import and use hoasca in religious ceremonies, subject to reasonable conditions.  <u>O Centro Espírita Beneficiente União do Vegetal v. Ashcroft</u>, 282 F. Supp. 2d 1236 (D. N.M. 2002) (<u>UDV I</u>), <u>aff'd</u>, 389 F.3d 973 (10th Cir. 2004) (en banc); <u>see</u> Pls.' Ex. 20 (copy of the UDV preliminary injunction).  The Supreme Court upheld the preliminary injunction.  <u>Gonzales v. O Centro Espírita Beneficente União do Vegetal</u>, 546 U.S. 418 (2006).  As of now,

7   - FINDINGS OF FACT AND CONCLUSIONS OF LAW

a final judgment has not been issued in the UDV litigation.

After Goldman's arrest in 1999, plaintiffs decided to
practice their religion in secret, so they stopped keeping
records of the Daime tea supply and of church activities.  In
2006, after the Supreme Court's decision in the UDV case,
plaintiffs resumed their record keeping.  Plaintiffs brought
this action in September 2008.

**IV.  Health Effects of Daime Tea**

The parties dispute the extent of the danger posed by the
consumption of Daime tea during church ceremonies.  There is no
question that Diame tea could be dangerous if used improperly.
Almost any substance can be toxic under the right conditions.

The Santo Daime church brews Daime tea in Brazil during an
elaborate religious ritual.  Men gather the woody *B. caapi* vine
and pound it for hours with mallets, while women collect and
clean the *P. viridis* leaves.  The shredded vine is boiled for
many hours, constantly tended.  *P. viridis* leaves are not added
until boiling is nearly complete because the DMT dissolves
rapidly.

The resulting tea is a reddish brown liquid, with a very
unpleasant bitter taste.  Church members usually drink between
45 to 150 milliliters of Daime tea during ceremonies, enough to
provide 15-60 milligrams of DMT, a small, barely effective
amount.  See Gerule Am. Statement at 8.

Users may experience anxiety and discomfort soon after
drinking Daime tea.  In perhaps a third of users, Daime tea
initially causes nausea and vomiting.  It less frequently
causes diarrhea.  Church members view these ostensibly

unpleasant effects as a beneficial purging or cleansing.  Daime
tea may also cause mild increases in heart rate (5 to 15 beats
per minute) and blood pressure.

Daime tea's psychoactive effects begin about 20 to 30
minutes after ingestion, and last 1 to 2 hours.  The body
eliminates DMT in about 3 to 4 hours.

As Daime tea takes effect, members may sit quietly with
eyes half-closed.  Users describe the experience as dream-like.
They may experience visual effects, although not true
hallucinations (i.e., the person is aware that the effect is
not real); alterations in the perception of time and space; and
intense emotions, including euphoria.  Users report profound
insights into their personal problems.

Goldman states that in all his years with CHLQ, he has not
observed anyone who suffered serious physical or mental harm
caused by Daime tea.  No apparent ill effects were found in
Brazilians who had regularly consumed hoasca during religious
services for more than thirty years.  Defs.' Ex. 1169 at 40.
Several of plaintiffs' experts suggest that Daime tea or hoasca
may actually benefit church members' mental and physical
health, although these experts caution that larger and more
rigorous scientific studies are necessary to confirm possible
health benefits.

Defendants have not presented evidence that Daime tea is
addictive or causes long-term health problems.  Defendants'
experts cite studies of LSD, pure DMT, or other powerful
hallucinogens.  <u>See, e.g.</u>, Frankenheim Statement at 8, 11;
Tella Statement at 6 (comparing the DMT in ayahuasca to pure

injected DMT). I find studies of LSD and pure injected DMT are only marginally relevant in evaluating the risks of consuming Daime tea in a religious ceremony. LSD is one of the most potent and powerful hallucinogenic drugs known, whose effects may last 8 to 12 hours. When DMT is injected, smoked, or inhaled, it is far more powerful, although shorter-acting, than DMT consumed in Daime tea. One researcher has found that the harmala alkaloids in hoasca and Daime tea appear to render DMT "far less potent." Defs.' Ex. 1122 at 176.

In 2006, plaintiffs commissioned a study of CHLQ members by Dr. John H. Halpern, a psychiatrist. Dr. Halpern has written extensively on use and abuse of hallucinogenic drugs, including a paper on the health of members of the Native American Church who consume peyote as a sacrament. See Defs.' Ex. 1154 (John H. Halpern, et al., Psychological and cognitive effects of long-term peyote use among Native Americans (2005)). Dr. Halpern's peer-reviewed report on CHLQ, published in August 2008, is apparently the only such study of Santo Daime church members in the United States. See Defs.' Ex. 1103 (John H. Halpern, et al., Evidence of health and safety in American members of a religion who use a hallucinogenic sacrament). Although Dr. Halpern frankly acknowledges the study's limitations, I find the study is relevant and useful in evaluating the health effects of Daime tea on plaintiffs.

Dr. Halpern interviewed 32 of CHLQ's 40 active members. The interviewees' experience ranged from 20 to 1300 Daime tea ceremonies. Dr. Halpern found that the church members interviewed generally were mentally healthy and appeared to

have benefitted from their participation in CHLQ services.

Five members who reported past alcohol dependence, and one who reported past alcohol abuse, attributed their recovery and continued abstinence from alcohol to attending CHLQ services. This is in accord with a research paper on members of Santo Daime and UDV, which noted that "dedicated members of these modern religions typically lose their interest in the habitual use of alcohol, cocaine, and other addictive substances." Defs.' Ex. 1118, at 245 (J.C. Callaway, et al., Pharmacokinetics of Hoasca alkaloids in healthy humans)).

About 60% of CHLQ members interviewed reported histories of psychiatric conditions. Dr. Halpern stated that the study suggests that participation in the Santo Daime church "is not proving harmful even to those members most susceptible to mental health problems." Defs.' Ex. 1103, at 20. Dr. Halpern cites a double blind study of Brazilian Santo Daime members which noted acute amelioration of anxiety and panic in church ceremonies. Id. at 16.

Defendants' experts raise the possibility that Daime tea could cause acute or long-term psychosis. See Frankenheim Statement at 11. However, defendants rely more on speculation than empirical evidence to support this assertion. For example, one author, Robert Gable, systematically reviewed the available scientific literature on risks of ingesting hoasca and Daime tea. Defs.' Ex. 1089 (Robert Gable, Risk assessment of ritual use of oral dimethyltryptamine (DMT) and harmala alkaloids (2007)). Gable cited a study of UDV members in Brazil which found that out of an estimated 25,000 servings of

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

hoasca, there were between 13 and 24 cases in which hoasca may
have contributed to a psychotic incident.  Gable concluded that
the "reported UDV rate of psychotic episodes under 1% suggests
that the use of hoasca is not a triggering event for sustained
psychosis.  Many or most of the UDV psychotic episodes were
transient in nature and resolved spontaneously."  Id. at 30.
Defendants' expert Alexander Walker argues that Gable minimizes
the risk of psychosis because the cited study covered 25,000
uses of hoasca, not 25,000 different persons using hoasca.
Even so, the study still indicates only a small risk that Daime
tea will cause a transient psychotic episode, and an even
smaller risk that Daime tea will cause long-term psychosis.

Plaintiffs' expert George Gerding states that set (i.e.,
the drug user's purpose and expectations), and setting are
important to determining how a drug will affect a person.  I
find that the set and setting fostered by CHLQ reduce the
potential danger posed by Daime tea.  Plaintiffs' screening and
orientation process attempts to ensure that when applicants
first drink Daime tea during a church service, they do so with
the proper frame of mind.

The Santo Daime church forbids proselytizing.  Potential
new members usually learn about CHLQ through word of mouth from
friends or relatives.  Applicants generally must have a sponsor
who is already a church member.  If the sponsor's answers to
questions about the applicant are acceptable, the applicant is
given reading material about the Santo Daime religion.  The
applicant is then screened and receives an orientation.

Goldman describes Daime tea as an arduous spiritual path

12  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

that is not suitable for most people.  In its screening
process, CHLQ attempts to select only those who are serious
about the Santo Daime religion, and to turn away would-be
recreational users or thrill-seekers.  CHLQ demands a serious
commitment of time and energy from members, requiring
attendance three or four times per month at services lasting
several hours and sometimes almost all night.  Members are
expected to learn some Portuguese so that they can understand
the hymns sung at most services.

Plaintiffs also attempt to screen persons who might be too
weak physically, or too unstable mentally, to drink Daime tea
safely.  Plaintiffs' screening process is not perfect, but
their track record indicates it has worked well enough.  An
applicant occasionally may be allowed to participate in a CHLQ
work within a day of the initial interview.  However, the
orientation is usually a longer process.

Plaintiffs give applicants detailed medical questionnaires
to determine whether an applicant has a medical condition or is
taking drugs, such as antidepressants, that might conflict with
drinking Daime tea.  CHLQ has prepared a seven-page list of
drugs that might cause problems in combination with Daime tea.
CHLQ periodically updates the list.  CHLQ also advises members
to avoid certain foods, such aged cheese, and drink, such as
red wine, before drinking Daime tea.

Plaintiffs ask applicants about psychiatric histories,
criminal records, and drug and alcohol abuse.  Goldman
testified that if an applicant has a history of psychiatric
problems, plaintiffs try to determine whether person might

benefit from the Daime tea.  If a screener determines that an applicant needs the type of attention or environment that the church cannot provide, the screener will turn the applicant away no matter how enthusiastic the applicant is.

Defendants criticize plaintiffs for not conducting a more formal interviewing process.  I note that the Native American Church does not request medical information before allowing new applicants to participate in services, even though the peyote consumed during NAC religious ceremonies contains mescaline, a hallucinogen comparable in strength to the DMT in Daime tea. The application form for membership in the Native American Church seeks only name, address, phone number, tribe, and tribal enrollment.  Pls.' Ex. 40.

Turning to setting, CHLQ permits plaintiffs to drink Daime tea only in a controlled and supportive religious ceremony. Access to the Daime tea is limited to three or four church leaders.  The spiritual leader who conducts the service dispenses Daime tea individually to each worshiper. Consumption of Daime tea outside of the church is a serious sacrilege.

During services, men and women sit separately.  Members generally are required wear modest white clothing.  They are forbidden to leave the ceremony once the service begins.

The church designates experienced church members as "guardians" to monitor the congregation during services and tend to members, particular new ones, who are suffering from nausea, diarrhea, or other discomforts.  The spiritual leader conducting the ceremony circulates among the congregation to

counsel those who appear anxious or upset.  Three church members are physicians and two are registered nurses, so a person with medical training is often present during services.

On rare occasions, plaintiffs have permitted children to drink Daime tea, but only a token or symbolic amount.  There is no evidence that the church allows children to drink enough Daime tea to experience psychoactive effects.  Given the tea's repulsive and nauseating taste, it seems unlikely that a child would want more than a sip.

Defendants also raise the possibility that a fetus may be harmed if a pregnant woman ingests Daime tea.  Defendants cite no evidence that pregnant CHLQ members have consumed Daime tea, or that any harm has occurred.  I note that in the Brazilian UDV church, pregnant women routinely drink hoasca, and studies have not reported harm.  <u>See, e.g.</u>, Defts.' Ex. 1088 at 11 (Dennis J. McKenna, et al., <u>The Scientific Investigation of Ayahuasca: A Review of Past and Current Research</u>) ("most" women drink hoasca "throughout pregnancy and lactation").

Defendants argue that consuming Daime tea could be fatal.  However, defendants have not presented evidence of that Daime tea or hoasca has caused any deaths, although there theoretically is a toxic dose.  Plaintiffs' experts state that the risk of a toxic overdose is minimized by the emetic effect of Daime tea.

In Brazil, thousands of people consume hoasca or Daime tea several times each month.  The government of Brazil would not allow the UDV and Santo Daime churches to operate if there was evidence that Daime tea or hoasca was killing church members.

One researcher recently noted that, to his knowledge, "there have been no deaths caused by hoasca or any other traditional . . . ayahuasca brews."  Defs.' Ex. 1089 at 29.

Defendants submit evidence regarding two deaths, neither of which had anything to do with Daime tea or hoasca.  One death reportedly occurred after the victim ingested an unknown potion that contained a very powerful drug, 5-methoxy-N,N-dimethyltryptamine, which is not an active component of Daime tea.  The authors of the report admitted that "the composition, dosage, and precise dosing timeframe are unknown."  Pls.' Ex. 46 at 407.  Antihistamine was also found in the victim's system, which could have contributed to the death by suppressing the vomiting reflex.

The other death cited by defendants is also irrelevant.  The autopsy report concluded that the victim, a 71-year-old woman, had died from "acute nicotine intoxication" after being given repeated doses of a brew containing tobacco leaves.

Defendants raise other possible dangers, based largely on extrapolation from studies of other drugs and on speculation.  For example, defendants assert that Daime tea could cause "central serotonin syndrome" if a person is also taking an antidepressant such as Prozac.  Defendants have no evidence that drinking Daime tea or hoasca has caused this syndrome.  In any event, Prozac and similar drugs are on plaintiffs' list of drugs that should be taken cautiously, if at all, with Daime tea.

**V.  Diversion**

Defendants raise the possibility that plaintiffs will

allow the diversion of Daime tea to non-church members,
including recreational users.  Defendants cite the testimony of
DEA Deputy Directory Denise Curry, who states that the amount
of Daime tea confiscated from Goldman in 1999 indicated that
CHLQ possessed more Daime tea than needed for its members.
However, defendants not presented evidence that plaintiffs have
ever allowed Daime tea to be used without the church's
authorization.  Because plaintiffs believe that Daime tea is a
sacrament, use of Daime tea outside of the church violates
church doctrine.

Nor have defendants presented evidence of a viable market
for Daime tea.  DMT itself is not a common drug of abuse.

Except when plaintiffs practiced their religion in secret
from 1999 to 2006, they have kept detailed perpetual logs
tracking the supply of Daime tea.  Only three or four leaders
of each church have access to the supply of Daime tea.

### CONCLUSIONS OF LAW

## I.  The Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA) prohibits the
federal government from "substantially burden[ing] a person's
exercise of religion even if the burden results from a rule of
general applicability."  42 U.S.C. § 2000bb-1(a).  RFRA allows
the federal government to "substantially burden a person's
exercise of religion only if it demonstrates that application
of the burden to the person (1) is in furtherance of a
compelling governmental interest; and (2) is the least
restrictive means of furthering that compelling governmental
interest."  Id. § 2000bb-1(b).

The Ninth Circuit recently explained that "[t]o establish a prima facie RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements. First, the activities the plaintiff claims are burdened by the government action must be an 'exercise of religion.' Second, the government action must 'substantially burden' the plaintiff's exercise of religion." Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc) (quoting 42 U.S.C. § 2000bb-1(a)), petition for cert. filed, 77 U.S.L.W. 3412 (Jan. 5, 2009)(No. 08-846).

If a plaintiff meets the initial burden, the burden then shifts to the government to prove "that the challenged government action is in furtherance of a 'compelling governmental interest' and is implemented by 'the least restrictive means.'" Id. (quoting 42 U.S.C. § 2000bb-1(b)). If the government cannot meet its burden under this strict scrutiny test, "the court must find a RFRA violation." Id.

## II.  Plaintiffs Have Met Their Burden of Proof

Plaintiffs have established their prima facie claim by more than a preponderance of the evidence. Plaintiffs have established that they are sincere in their religious beliefs, and that the ceremonial use of the Daime tea is essential to their religion.

It is obvious that prohibiting the use of Daime tea would substantially burden the exercise of plaintiffs' religion. To paraphrase the California Supreme Court's observation about the role of peyote in the Native American Church, the ceremonial

use of Daime tea is "the sine qua non of [plaintiffs'] faith.
It is the sole means by which [plaintiffs] are able to
experience their religion; without [Daime tea] [plaintiffs]
cannot practice their faith." <u>People v. Woody</u>, 61 Cal. 2d 716,
725, 40 Cal. Rptr. 69, 394 P.2d 813, 820 (1964).

In the UDV litigation, at least at the preliminary
injunction hearing, the government conceded that the UDV
plaintiffs had made a prima facie claim under RFRA.  Here,
however, defendants challenge plaintiffs' sincerity, citing
plaintiffs' decision to conduct ceremonies in secret until the
Supreme Court ruling in favor of the UDV plaintiffs.
Plaintiffs' secrecy does not show a lack of sincerity.
Instead, it shows that plaintiffs remained committed to
practicing their religion despite the threat of criminal
prosecution and loss of professional status.

## III.  Defendants Have Not Met Their Burden

### A.  Compelling Interest

The government asserts that it has shown compelling
interests in prohibiting the Daime tea: protecting the health
of plaintiffs and others who drink Daime tea; and preventing
Daime tea from being diverted to recreational users.
Defendants also assert an interest protecting the integrity of
the DEA's process for regulating controlled substances.

I conclude that the government has failed to show that
these interests justify prohibiting Daime tea outright.  These
interests will addressed through the terms the injunction I
will issue governing plaintiffs' use of Daime tea.

Generally speaking, the government may be said to have a

compelling interest in regulating any drug listed on Schedule I
of the Controlled Substances Act.  Of course Daime tea could be
dangerous if misused.  However, RFRA requires a more specific
inquiry into the government's compelling interest.  See UDV,
546 U.S. at 430-31.  Here, the evidence shows that Daime tea is
consumed in a ritual setting by church members who have been
screened for physical or mental problems, and for potential
drug conflicts.

     The government argues that Daime tea is inherently unsafe
because it is not produced in an antiseptic laboratory with
synthetic ingredients.  The government correctly points out
that Daime tea varies in strength.  Plaintiffs do not contend
that Daime tea is a uniform product, but there is no evidence
that natural variations in the tea have caused problems.  This
concern is easily addressed by allowing the DEA to test the
Daime tea periodically.

     The government cites the potential danger to children.
There is no evidence that children were harmed when given token
amounts of Daime tea.  When Daime tea is not being dispensed at
church services, it is kept under lock and key.

     The government raises the specter of danger to pregnant
women or to fetuses.  There is no evidence that any such harm
has occurred in Oregon or elsewhere.

     The government also asserts a compelling interest in
preventing diversion to recreational users.  The government has
not presented evidence that there is a significant market for
Daime tea.  The government also has not presented evidence that
plaintiffs have allowed the diversion of a single drop of Daime

20  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

tea.  This is an issue best addressed through reasonable
guidelines for storing and inventorying plaintiffs' supply of
Daime tea.

The government argues that it has a compelling interest in
maintaining the integrity of the DEA's administrative process
for approving religious exemptions to the Controlled Substances
Act.  The Supreme Court rejected this argument in <u>UDV III</u>,
stating RFRA "plainly contemplates that *courts* would recognize
exceptions to how the law works."  546 U.S. at 434 (original
emphasis).

### B.  Prohibition Is Not the Least Restrictive Means

The government has failed to show that outright
prohibition of the Daime tea is the least restrictive means of
furthering its interests.  Here, the opinions issued by the
trial and appellate courts in the UDV litigation are
persuasive.  The district court, after holding extensive
hearings, concluded that the evidence on health risks caused by
drinking hoasca were "in equipoise," meaning that the
government had failed to carry its burden under RFRA.  Many of
the same experts for the government here also testified in the
UDV litigation.  Research completed since the district court's
decision in 2002, including Dr. Halpern's study of these
plaintiffs, further undermines the government's arguments for
complete prohibition.  I also find it persuasive that the State
of Oregon considers CHLQ's use of the Daime tea in religious
ceremonies to be a sacramental use that is not subject to
regulation.

The Native American Church's use of peyote in religious

ceremonies is instructive on the feasibility of allowing plaintiffs to continue the religious use of Daime tea.  The NAC has about 300,000 members.  After an applicant completes a simple application form, he or she may participate in ceremonies involving the consumption of peyote.  There is no evidence that the NAC's distribution and use of peyote have resulted in any significant diversion to recreational users, or serious health effects to NAC members.

Here, the Santo Daime church in Oregon has fewer than 100 members.  The DEA, which monitors the NAC's use of peyote, should be capable of shouldering the administrative burden of monitoring the importation and distribution of Daime tea in Oregon.  A permanent injunction will be entered promptly consistent with this Findings of Fact and Conclusions of Law.

I need not address plaintiffs' claim under the Equal Protection Clause of the Fifth Amendment.

### CONCLUSION

Plaintiffs are entitled to relief under RFRA.  Judgment will be entered for plaintiffs in accordance with this opinion.

IT IS SO ORDERED.

DATED this ___18___ day of March, 2009.

OWEN M. PANNER
U.S. DISTRICT JUDGE